# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CT-02291-SCT

**DERRICK BROWN a/k/a DERRICK LATORY BROWN a/k/a DEDRICK BROWN**

**v.**

**STATE OF MISSISSIPPI**

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/04/2005 |
| TRIAL JUDGE: | HON. ANDREW C. BAKER |
| COURT FROM WHICH APPEALED: | TATE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAVID L. WALKER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE TATE COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED. CONVICTION OF THE SALE OF A CONTROLLED SUBSTANCE, COCAINE, AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH SIX (6) YEARS SUSPENDED PENDING FUTURE GOOD BEHAVIOR AND OTHER CONDITIONS, AFFIRMED. APPELLANT SHALL PAY A FINE OF $5,000.00 AND A LAB FEE OF $125.00 - 11/29/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. After a jury trial in the Tate County Circuit Court, Derrick Brown was found guilty of the sale of a controlled substance, cocaine, in violation of Mississippi Code Annotated section § 41-29-139 (a)(1) (Rev. 2005). The trial judge sentenced Brown to a term of fifteen years in the custody of the Mississippi Department of Corrections, with six years suspended pending his future good behavior, and to pay a fine of $5,000. From the circuit court judgment of conviction and sentence, Brown appealed to us, and we assigned this case to the Court of Appeals. Brown alleged that his federal and state constitutional rights to confront the witnesses against him were violated by the trial court's erroneous admission of hearsay evidence, and that the trial court erroneously denied his proffered jury instruction on his entrapment defense. The Court of Appeals found that Brown's claimed error regarding hearsay evidence had merit; therefore, it reversed the trial court judgment and remanded the case for a new trial. *Brown v. State,* 2007 Miss. App. LEXIS 19 (Miss. Ct. App. Jan. 23, 2007). After the Court of Appeals denied the State's motion for rehearing, the State filed with us a petition for writ of certiorari, which we granted. *Brown v. State*, 2007 Miss. LEXIS 480 (Miss. Aug. 23, 2007). After consideration of the record and the applicable law, we reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of conviction and sentence entered by the Circuit Court of Tate County.

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶2. On November 3, 2003, Antonio Echols, a confidential informant (C.I.) for the Panola County Narcotics Task Force (Task Force), contacted Task Force Commander Jason Chrestman about the possibility of buying four ounces of crack cocaine from Elmer "Little

2

Fudge" Armstrong. Chrestman and the Task Force had used Echols as a C.I. on several occasions in the past. By the time Echols contacted Chrestman, Echols already had made telephone contact with Armstrong, whom Echols had met while incarcerated. Armstrong, who resided in Tunica, placed Echols on a three-way call with two unidentified individuals to set up the drug deal. Chrestman wanted to set up the drug buy to occur around Crenshaw, in northern Panola County, but either Armstrong or the unidentified individuals refused to come to Panola County; therefore, the cocaine sale was scheduled to take place at the Wal-Mart store in Senatobia, the county seat of Tate County. This phone conversation was not recorded. Following established protocol, Chrestman contacted Tate County Sheriff Shelton Ingram to inform him of the Task Force's anticipated presence in Tate County, whereupon Sheriff Ingram offered the assistance of his department in this undercover controlled buy.

¶3. Commander Chrestman had Echols come to the Panola County Narcotics Task Force office to set up the buy. After arriving at the Task Force office, Echols made a phone call to certain unidentified individuals while the Task Force recorded the phone call with Echols's knowledge. These unknown individuals informed Echols that they had only two ounces of crack cocaine which they could sell him. Echols agreed to the buy. Thereafter, Echols was searched by Task Force officials, wired and given $1,600 with which to buy the drugs. Echols was dropped off at the Wal-Mart to await the drug purchase. With law enforcement officials providing surveillance and security in this "controlled-buy," Echols waited in the Wal-Mart parking lot approximately two hours, during which time he made several calls to the individual(s) to inquire about their progress toward Wal-Mart. The

3

individual(s) told Echols that they were coming in a blue Monte Carlo, which later was changed to a white Delta 88. The Task Force recorded all the calls through Echols's body wire. During trial, the Task Force's audiotape recording of Echols's phone conversations prior to the drug buy, as well as a transcript of the tape-recorded phone conversations, were admitted into evidence by the trial. However, Echols and several law enforcement officers testified that the identity of the individual(s) with whom Echols was speaking was unknown.

¶4.    After dropping Echols off in the Wal-Mart parking lot, officers from the Task Force, the Drug Enforcement Agency in Oxford, and the Tate County Sheriff's Department positioned themselves in several locations in and near the Wal-Mart parking lot. The officers observed a white Oldsmobile Delta 88 enter the parking lot of the Rascals gas station and convenience store near the Wal-Mart parking lot. A man wearing a red shirt stepped out of the Delta 88 and entered the gas station, while the driver proceeded to Wal-Mart, where he approached Echols. Echols opened the back passenger door of the car. The driver instructed Echols to get in the car. However, Echols refused, claiming that he had been robbed in the past. Instead, Echols showed the driver the money. The driver told Echols he would be right back. In fact, the driver returned two to three minutes later, after picking up the man (wearing the red shirt) whom he had previously dropped off at the gas station. Echols got into the back seat of the Delta 88 and handed the passenger $1,600 in exchange for a plastic baggie, which appeared to contain crack cocaine. Law enforcement officers immediately descended on the car and arrested the driver, identified as Derrick Brown, and the passenger wearing the red shirt, who was identified as Derrick Black.

¶5. The plastic baggie was sent to the Mississippi Crime Laboratory and found to contain 1.53 ounces of crack cocaine. A videotape depicting the activities at the Rascals gas station and the Wal-Mart parking lot, including the post-buy arrest, was introduced at trial. Found inside the white Delta 88 were several cell phones, a box of sandwich bags in the trunk, and the $1,600 identified as the "buy money" which Task Force officials had given to Echols. Agent Jamie Tedford of the Drug Enforcement Agency testified that it is normal for narcotics to be sealed in sandwich bags. Tedford also testified that he interviewed Brown after advising him of his *Miranda* rights. Tedford told the jury that Brown had said that Little Fudge had supplied the drugs and that Brown had given Tedford a description of Little Fudge's vehicle and residence.

¶6. After the State rested its case-in-chief, and during the defendant's case-in-chief, Brown testified in his own behalf He stated that on November 3, 2003, he had planned to go to Wal-Mart in Senatobia to place a toy on layaway for his son. According to Brown, Black had told Brown that he wanted to go with him and had asked Brown to drive because Black did not have a driver's license. When they arrived at the Rascals gas station and convenience store, Black asked to be dropped off, and Brown stated he assumed Black had to use the rest room. Brown dropped off Black and continued to Wal-Mart. Brown further testified that as he proceeded to Wal-Mart, Echols, a man Brown claimed not to have known prior to that day, flagged him down. Echols showed Brown some money, and Brown left to go back to the gas station to pick up Black, whereupon the two of them then returned to the Wal-Mart parking lot. Brown approached Echols a second time, this time with Black in the

5

passenger seat. Echols got into the back seat of the car. Black and Echols then transacted the drug sale. Brown testified that he previously had not been aware that a drug sale would occur. Brown stated that he never would have agreed to come to Senatobia with Black had he known about the drug deal. Brown did admit, however, that he knew Armstrong because "we basically went to school together, you know, from first grade all the way through."

¶7.     Based on testimony presented at trial, the jury found Brown guilty of the sale of cocaine as an aider and abettor.[1] Brown filed a motion for a new trial or in the alternative, judgment notwithstanding the verdict (JNOV), and the trial court denied both motions.

### PROCEEDINGS IN THE COURT OF APPEALS

¶8.     On appeal, Brown asserted two issues which the Court of Appeals considered: (1) whether the trial court's admission of hearsay evidence violated Brown's federal and state constitutional rights to confront the witnesses against him; and (2) whether the trial court erroneously denied his proffered jury instruction on entrapment. While the Court of Appeals found no error in the trial court's refusal of a jury instruction on entrapment, it did find that the trial court erroneously admitted hearsay evidence that substantially prejudiced Brown. ***Brown***, 2007 Miss. App. LEXIS 19, **7-19, ¶¶11-22. Therefore, the Court of Appeals reversed and remanded this case for a new trial.

---

[1]Derrick Brown and Derrick Black were indicted together for this crime. By the time Brown was sentenced for this crime, Black had already been tried, convicted, and sentenced by the same trial judge. Both defendants received identical sentences.

¶9.    In particular, the Court of Appeals determined that the Task Force's audiotape recording of Echols's phone conversations prior to the drug sale, as well as the transcript of the tape-recorded phone conversations, constituted inadmissible hearsay. *Id.* The trial court had ruled that, because the persons to whom Echols had been speaking were unidentified, the tape was admissible for the purpose of showing that the conversations took place and the gist of those conversations. However, the Court of Appeals held that the evidentiary function of the audio recording was to relay impermissible hearsay evidence to the jury, tending to show the planning of a drug transaction by either Brown or Black. *Id.*, **16-17, ¶19. Additionally, the Court of Appeals found that the admission of the taped conversations substantially prejudiced Brown, requiring reversal of the jury verdict and a new trial. *Id.*, **18-19, ¶22.

¶10.    The Court of Appeals found Brown's contention involving his entrapment defense to be without merit. *Id.*, **19-24, ¶¶23-26.

## DISCUSSION

¶11.    The Court of Appeals addressed both the hearsay issue as to the taped phone conversations and the entrapment issue. However, since it granted relief to Brown on the hearsay issue, the Court of Appeals understandably chose not to address the issue of whether the admission of the taped phone conversations violated Brown's federal and state constitutional rights of confrontation. In its petition for writ of certiorari, the State addressed only the issue on which the Court of Appeals reversed the trial court judgment. Finding that the Court of Appeals properly concluded the issue was without merit, we will limit the

7

question for review on certiorari. *Yelverton v. Yelverton*, 961 So. 2d 19, 23-24 (Miss. 2007) (citing M.R.A.P. 17(h)). *See also Dedeaux v. Pellerin Laundry, Inc.*, 947 So. 2d 900, 903 (Miss. 2007).

¶12. We will address not only the issue on which the Court of Appeals reversed the trial court judgment – whether the statements in the audiotaped phone conversations, and the written transcription of these tapes constituted impermissible hearsay – but also the issue not addressed by the Court of Appeals:  whether Brown's federal and state constitutional rights to confront the witnesses against him were violated by the trial court's admission of alleged hearsay evidence via the taped phone conversations.

## I. WHETHER THE PRE-DRUG-BUY STATEMENTS CONTAINED IN THE AUDIOTAPED PHONE CONVERSATIONS BETWEEN THE CONFIDENTIAL INFORMANT AND UNKNOWN PERSONS CONSTITUTED IMPERMISSIBLE HEARSAY.

¶13. Our well-founded standard of review for the admission or exclusion of evidence in Mississippi is abuse of discretion. *Troupe v. McAuley*, 955 So. 2d 848, 855 (Miss. 2007) (citing *Poole v. Avara*, 908 So. 2d 716, 721 (Miss. 2005)).  Thus, "[a] trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence.  Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Shaw v. State*, 915 So. 2d 442, 445 (Miss. 2005) (citing *Jefferson v. State*, 818 So. 2d 1099, 1104 (Miss. 2002) (quoting *Fisher v. State*, 690 So. 2d 268, 274 (Miss. 1996))).  M.R.E. 103(a). *See also Hill v. State*, 774 So. 2d 441, 444 (Miss. 2000); *Crawford v. State*,

754 So. 2d 1211, 1215 (Miss. 2000); *Gilley v. State*, 748 So. 2d 123, 126 (Miss. 1999);

*Hughes v. State*, 735 So. 2d 238, 269 (Miss. 1999).

¶14.    During the trial, an audiotape was received into evidence and played for the jury.  The

tape depicted, *inter alia*, the pre-buy arrangements among Echols and unknown persons as

to the quantity of the purchase and the pre-arranged location for the sale to take place.  At

the time the tape was offered, defense counsel objected on grounds of hearsay and

constitutional violations, namely the denial of the right of a defendant to confront the

witnesses against him.  On this issue, the record reveals the following:

> By [Defense Counsel]: Judge, I would again object to this hearsay and cite the
> constitutional provisions I previously cited and the Mississippi Rule of
> Evidence 611.  Mr. Echols doesn't even know these individuals' names, Judge
> and it deprives Mr. Brown of his constitutional right to cross-examine
> witnesses because we can't subpoena them to be here without knowing who
> their names are nor confront them because obviously we don't know who they
> are.
>
> The Court:  I believe the testimony from this witness is he doesn't know the
> name but the prosecutor is offering this tape for the purposes of showing that
> the conversation took place and this is the gist of that conversation.  You are
> not trying to tell who is on the tape, are you?
>
> [Echols]:      No, sir.
>
> The Court:    Okay.  It can be received into evidence.

Other than the voice of Echols on the tape, neither Echols nor any of the law enforcement

witnesses could identify the voices on the audiotape.  The State asserts that, contrary to the

position taken by the Court of Appeals, the trial court did not abuse its discretion by

admitting the tape into evidence,  or if it was error, the error was harmless.

9

¶15. Brown argues that the admission of the audiotape made prior to the drug transaction was error. Specifically, Brown contends that no witness was able to identify the voices on the audiotape, other than the C.I.'s voice; thus, Brown asserts the audiotape was inadmissible hearsay which prohibited Brown from confronting the witnesses against him. Furthermore, Brown contends that the audiotape was introduced into evidence and heard by the jury, yet his voice was never identified on the tape.

¶16. Mississippi Rule Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Stated another way, an out-of-court statement is not hearsay unless the party offering the statement is attempting to prove that the statement is true. While it is true that neither the C.I. nor the law enforcement officers who testified for the State could identify Brown's voice on the tape, the failure to identify Brown does not render the tape inadmissible.

¶17. In fact, the tape was offered to prove that pre-arrangement conversations had taken place, as Echols and other law enforcement officers had previously testified. In effect, the audiotape corroborated the various witnesses' testimony. Therefore, sufficient testimony existed to admit the tape for the purpose of proving that the conversations had taken place as well as the gist of those conversations. The audiotape was not offered to show that Brown was involved in the pre-arrangement conversations, nor could it have been. A careful review of every word and sentence on the audiotape reveals no statement which the State needed to prove as true. The tape contains such utterances as, "Ain't got but two left" . . . "I want it

10

hard man" . . . "Yeah. I'm with my bride but I'm going to be walking out where I can see you

man." The State had no need to prove these statements, or any of the other statements on the

audiotape, were true. Thus, the statements were not hearsay, and the trial court properly

overruled Brown's hearsay objection.[2]

¶18.    On this issue, the Court of Appeals reasoned that:

> Because the State presented no evidence identifying the persons on the tape,
> this Court is unable to determine whether the statements on the tape would be
> exempt from hearsay as admissions by a party-opponent under Rule
> 801(d)(2)(A) (in the case of Brown's own statements) or 801(d)(2)(E) (in the
> case of statements by a co-conspirator, Black, offered against Brown). As the
> declarants were anonymous, we also are unable to assess the applicability of
> any hearsay exceptions dependant upon the declarant's unavailability. M.R.E.
> 804.   Further, insufficient evidence of the context of the anonymous
> declarant's statements was established by the proponent to enable our
> assessment of the applicability of hearsay exceptions under Rule 803.

*Brown v. State*, 2007 Miss. App. LEXIS 19, **17-18, ¶20 (Miss. Jan. 23, 2007). However

such analysis is inapplicable to the facts of today's case. Clearly, a discussion of hearsay

exceptions is unnecessary when the statements under attack are not hearsay.

¶19.    Furthermore, the Court of Appeals stated:

> Moreover, the erroneous admission of the taped conversations substantially
> prejudiced Brown, necessitating reversal and remand for a new trial. M.R.E.
> 103(a). Brown testified in his defense that, until the moment of the drug sale,
> he had not known or intended that any drug sale would occur. As already
> stated, the taped conversations invited the jury to assume either that Brown

---

[2]Additionally, by way of written instructions, the trial court instructed the jury, *inter alia*, that it must consider whether Brown aided, abetted or encouraged the "commission of the elements" of sale of cocaine; and the trial court also gave the verbatim jury instruction on aiding and abetting as adopted by this Court in *Milano v. State*, 790 So. 2d 179, 185 (Miss. 2001).

11

was the person on the tape planning the drug transaction, or that Brown was riding in the car listening to Black as Black planned the drug transaction. Therefore, the taped conversations substantially eroded the credibility of Brown's testimony.

*Brown*, 2007 Miss. App. LEXIS 19, **18-19, ¶22. However, as we already have stated, the audiotape was not offered for any purpose other than to corroborate the witnesses' testimony for the State that pre-buy conversations occurred between Echols and unknown persons. The State in no way attempted to identify voices on the tape other than the voice of the C.I., Echols. Additionally, the identity of the voices on the tape was irrelevant in the State's offer of the audiotape. The State was merely showing that pre-arrangement conversations had taken place, as well as the gist of those conversations. That being said, the introduction of the audiotape into evidence was proper.

¶20. For these reasons, we find that the trial court did not abuse its discretion in allowing into evidence, over hearsay objections, the tape-recorded conversations between Echols and unknown persons.

**II. WHETHER THE TRIAL COURT'S ADMISSION OF ALLEGED HEARSAY EVIDENCE VIA THE TAPED TELEPHONE CONVERSATIONS VIOLATED BROWN'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO CONFRONT THE WITNESSES AGAINST HIM.**

¶21. Brown asserts that, since Echols did not know the identity of the voices on the tape recording, other than his own, Brown was unable to subpoena these witnesses to testify at trial and thus to confront and cross-examine them; therefore, his rights under the Sixth Amendment to the United States Constitution, and Article 3, Section 26, Mississippi

12

Constitution (1890) were violated. However, we again note that neither Echols nor the law enforcement officials knew the identity of the voices on the tape, other than Echols, nor did the State or any of its witnesses attempt to state or imply that one of the unidentified voices on the tape recording was Brown's. The State was under no obligation to determine the identity of those persons whose voices were on the tape. If Brown believed that the voices on the tape were those of individuals other than himself and Black, he could have subpoenaed anyone he desired. Brown could have subpoenaed Elmer "Little Fudge" Armstrong, for the record reveals that both the State and Brown were interested in determining Armstrong's location. Evidently, no one appeared to know the location of Armstrong at the time of the trial of this case.

¶22.    As we stated in ***Ahmad v. State***, 603 So. 2d 843, 847 (Miss. 1992):

> Abdusabr Ahmad urges this Court to find reversible error because his constitutional right to confront his accuser was denied. Abdusabr Ahmad argues that his accuser is his wife and that he was not allowed to "confront" her. While he is correct that the Sixth Amendment of the U.S. Constitution guarantees a defendant the right of cross examination, *see* ***Boykin v. Alabama***, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); ***Pointer v. Texas***, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), Abdusabr Ahmad was not deprived of that right. As the State has pointed out, neither the appellant, nor the court, instructs the State what witnesses that party shall put on the stand or how that party shall present its case. ***Hickson v. State***, 512 So. 2d 1 (Miss. 1987). The State in the case at bar could not be required to present every witness, although Abdusabr Ahmad *did* have the right to cross examine any witness that the State did present. The record reveals that Abdusabr Ahmad was allowed to fully cross examine all State witnesses against him. Rasheedah Ahmad was not a witness at the trial. There is no indication in the record that this wife, Rasheedah Ahmad, ever accused him of felonious child abuse.

***Id.*** at 847.

¶23. At trial, the State called Jason Chrestman, commander of the Panola County Narcotics Task Force; Kenny Laughter, a narcotics investigator with the Tate County Sheriff's Department; Antonio Echols, the C.I.; Jamie Tedford, a Batesville policeman assigned to the Drug Enforcement Administration; and Teresia Hickman, a forensic scientist with the Batesville branch of the Mississippi Crime Laboratory. The record reveals that each of these witnesses was subjected to cross-examination by Brown, through his attorney. No issue was made of the admissibility of the videotape, which the jury viewed during the course of the trial. Upon consideration of the entire record, including a viewing of the videotape, this Court is firmly convinced that Brown suffered no prejudice, much less substantial prejudice, by the admission of the audiotaped phone conversations. The videotape shows: (1) a white Delta 88 pulling up to Echols in the Wal-Mart parking lot (the driver of the car was later identified as Derrick Brown); (2) Echols walking away from the car, which then pulled out of the Wal-Mart parking lot and traveled across the street to the Rascal's convenience store; (3) a man at Rascals in a red shirt (later identified as Derrick Black) getting into the white Delta 88 on the front passenger side; and (4) the white car, with Brown and Black inside, returning to the Wal-Mart parking lot.

¶24. The actual drug buy is not captured on the video, but the events occurring immediately thereafter are. These events include: (1) the drug purchase cash (in denominations of twenties and hundreds) lying on the front passenger seat of the car (where Black was

14

situated);[3] and (2) four cell phones on the front seats and in the console, as well as a Fred's Dollar Store box of sandwich bags, and rocks of what appeared to be (and were later identified to be) crack cocaine.

¶25. In sum, Brown suffered no substantial prejudice in that he was not denied his federal and state constitutional rights to confront witnesses based on the admission of the audiotaped telephone recordings of the pre-drug-buy conversations between the C.I. and unknown persons. As the trial judge stated in ruling on post-trial motions, "[t]his was a fairly straightforward drug deal. It is a situation where the C.I. was on a cell phone talking to two men who were willing to deliver and sell . . . $1,600 worth of cocaine. If you recall these cases were severed. Two separate trials were conducted by juries which freed these defendants to call witnesses, have a trial without co-defendant having to testify against co-defendant, or any way implicate."

¶26. We therefore find this issue is without merit.

## CONCLUSION

¶27. For the reasons stated, the judgment of the Court of Appeals is reversed and the judgment of conviction and sentence entered by the Circuit Court of Tate County is reinstated and affirmed.

---

[3]Officer Jamie Tedford testified that when law enforcement officials converged on the vehicle after the drug deal, the money actually was discovered on the ground (where Black had thrown it) and on the front-passenger-side floorboard. The money was recovered and placed on the front passenger seat for videotaping.

¶28.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THE JUDGMENT OF THE TATE COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED.  CONVICTION OF THE SALE OF A CONTROLLED SUBSTANCE, COCAINE, AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH SIX (6) YEARS SUSPENDED PENDING FUTURE GOOD BEHAVIOR AND OTHER CONDITIONS, AFFIRMED.  APPELLANT SHALL PAY A FINE OF $5,000.00 AND A LAB FEE OF $125.00**

**SMITH, C.J., WALLER, P.J., EASLEY, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J.  LAMAR, J., NOT PARTICIPATING.**

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

¶29.    I agree with the well-reasoned, unanimous opinion of the Court of Appeals that the audio recordings were impermissible hearsay and that the admission of these recordings substantially prejudiced Brown's defense.  Accordingly, I would affirm the Court of Appeals in reversing the case and remanding for a new trial.  I also write to address the majority's analysis of the confrontation issue.

**I. Hearsay.**

¶30.    For the reasons set forth by the Court of Appeals, I find that the recorded telephone conversations were impermissible hearsay that substantially prejudiced the defendant. *Derrick Brown v. State*, 2007 Miss. App. LEXIS 19, ¶ 22 (Jan. 23, 2007).  As the court correctly noted, an objective test is used in determining whether evidence is hearsay; the question is "how a reasonable objective observer would under the circumstances be likely to perceive the statement."  *Brown* at ¶ 19 (quoting *Harrison v. State*, 722 So. 2d 681, 684 (Miss. 1998)).  Although the State argues, and the majority agrees, that the statements were

16

offered simply to corroborate witness testimony, "the most powerful evidentiary function of the taped conversations was to relay hearsay evidence to the jury tending to show Brown and/or Black's prior planning of the drug transaction." *Brown* at ¶ 19.

The following excerpt is taken from the Court of Appeals's opinion:

[first phone call]

MB1: Hey what happen . . . what happen man?

MB2: What happened?

MB1: . . . I'm already in Senatobia man.  (Inaudible) N****r ain't got but two left now.

MB2: Ain't got but two left.

MB1: A . . .a . . . hey go on and bring two of them then.  Bring them two.  I need them real bad man.

MB2: I'm fixing to do that man.  I don't know you.  You don't know me but you know I'm fixing to come over there.

MB1: Hey I'm being watched now man.  Hey you going to have the phone?

MB2: Yeah I'm going to be in a blue Monte Carlo man.

MB1: You going to be in a blue Monte Carlo?

MB2: Yeah

MB1: (Inaudible) if I was you I'd probably in and out of Wal-Mart because there be a lot of you know security around.  I'm going to be in and out of Wal-Mart.

MB2: All right

MB1: Like I'm shopping.  Then I'll be calling you.

MB2: I tell yall I'm on my way now man.

17

MB1: I'm all ready up there man.

MB: A . . . yall bring the scales too cause I ain't got no scales.

MB1: I'm going to bring the scale.

. . . .

[second phone call]

MB1: Hello.  Where you at man?

MB2: [] I'm . . . what you want hard or soft man.  You never did say?

MB1: I want it hard man.

. . . .

MB1: How long you going to be man?

MB2: About thirty-five minutes.

. . . .

MB1: What . . . What you going to be man?

MB2: I'm going be in a blue Monte Carlo.

MB1: You wouldn't be sh**ting me man?

MB2: Hey look man you at Wal-Mart man?

MB1: Yeah I'm at Wal-Mart.

MB2: All right I'll be there.

. . . .

[third phone call]

18

MB1: You on your way man?

MB2: Yeah I'm on my way now (Inaudible)

MB1: All right

MB2: (Inaudible) twenty-five minutes.

MB1: Are you in a old model or new model?  I'm going to be looking for you?

. . . .

MB2: Huh . . . in a white Delta 88 man

MB1: You going to be in a white Delta 88?

MB2: (Inaudible)

MB1: O.K. you know how long you're going to be about what?

MB2: About twenty minutes

MB1: All right I'm waiting on you man.

. . . .

[fourth phone call]

MB2: Hello.

MB1: How far are you man?

MB2: Give me about two minutes man.

MB1: (Inaudible) I don't want to miss you man.  That's why I'm steady calling man. I'm going to call you in about another five minutes you be on it.

MB2: All right Rick.

MB1: All right.

19

. . . .

[another phone call]

MB1: Hello

MB2: Hello

MB1: Man

MB2: Yeah I got your (Inaudible)

MB1: H**l yeah man (Inaudible) security guard hangs around man.

MB2: S**t give me about . . . about ten minutes man.

MB1: All right

MB2: (Inaudible) hooked up

MB1: Come on man (Inaudible)

MB2: Hey you know where that store is man?

MB1: What store?

MB2: Right across . . . you know where that little gas station (Inaudible)

MB1: That little gas station?

MB2: Yeah since you're going to be sitting in the parking lot you know what I'm saying.

MB1: Yeah

MB2: You outside of Wal-Mart?

MB1: We're right here I told you I'm going to see you when you pull up man. I'm going to be right . . . I'm going to see you when you pull up.

MB2: All right what did you say you were in?

20

MB1: I'm . . .

MB2: Or are you walking?

MB1: Yeah.  I'm with my bride but I'm going to be walking out where I can see you though man.

MB2: All right Rick.

MB1: Hey I'm going to see you when you come in (Inaudible) though man.

MB2: All right Rick.

MB1: All right.

. . . .

¶31.   I cannot agree with the majority that these statements were mere "utterances" that were not offered to prove Brown's involvement.  The excerpt contains statements that the seller would be arriving in a white Delta 88 and that the seller would be bringing two ounces of hard cocaine and a scale.  There were also numerous statements regarding the speakers' progress to the buy location.  Thus, the jury was invited to credit these statements as true and infer that Brown was involved in the transaction.  Indeed, the State *admits* in its brief that the taped conversations were evidence that Brown was an accomplice to the sale.  Clearly "[t]he evidentiary value of the tape for the prosecution's stated purpose [i.e., proving the conversations took place] was marginal."  **Brown** at ¶ 18.

¶32.   The majority's analysis is troubling for other reasons as well.  First, while holding that the evidence could have been used only to corroborate witness testimony, the majority states that the jury was properly instructed on the elements of aiding and abetting.  I see no

21

connection between this instruction and the admissibility of the evidence, other than to infer that the conversations were presented as evidence of Brown's involvement.[4]

¶33. Second, the majority finds that the audiotape was not hearsay because "[t]he State had no need to prove these statements . . . were true." Whether the State *needed* to prove the truth of these statements is of no matter. The question is whether the statements were *offered* to prove their truth. M.R.E. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Because a reasonable, objective observer would perceive the statements as proof of the defendant's involvement, they fall within the definition of hearsay. *Harrison*, 722 So. 2d at 684.

¶34. I also find, as did the Court of Appeals, that this hearsay testimony substantially prejudiced the defendant and, therefore, constituted reversible error. Brown testified that he had not known about the drug sale and that he never intended to participate in the illegal transaction. With the exception of Agent Tedford's testimony that Brown identified Little Fudge as the source of the drugs – a statement Brown denied making – there was no direct evidence that contradicted Brown's version of events.[5] Therefore, because the taped

---

[4]The opinion notes that the jury was given the jury instruction adopted by this Court in *Milano v. State*, 790 So. 2d 179, 185 (Miss. 2001). However, the Court recently held that failure to give such an instruction did not constitute error. *Wilson v. State*, 2007 Miss. LEXIS 593 (Oct. 25, 2007).

[5]Contrary to the majority's finding, the videotape does not show "a white Delta 88 pulling up to Echols in the Wal-Mart parking lot" or "Echols walking away from the car." The video never shows any encounter between Echols and Brown. As stated by Tedford,

22

conversations "invited the jury to assume either that Brown was the person on the tape planning the drug transaction, or that Brown was riding in the car listening to Black as Black planned the drug transaction," the recordings substantially prejudiced Brown's defense. *Brown*, 2007 Miss. App. LEXIS 19, ¶ 22.

## II. Right to Confrontation.

¶35. Although I find reversible error in the hearsay admission, I also write to address the majority's analysis of the confrontation issue. First, the opinion grossly misstates the law and improperly shifts the burden of proof onto the defendant by holding that "[t]he State was under no obligation to determine the identity of those persons whose voices were on the tape," and that Brown "could have subpoenaed anyone he so desired." Such a holding is directly contrary to the fundamental concept in criminal law that "it is the State's burden to put on witnesses to establish guilt." *Fox v. State*, 756 So. 2d 753, 762 (Miss. 2000) (citing *McVeay v. State*, 355 So. 2d 1389 (Miss. 1978)). The majority assumes that Brown knew the identity of the individuals on the tape, which, in turn, assumes his guilt. In other words, Brown must prove his innocence before he may claim any right to confront the witnesses against him. The law prohibits the prosecution from commenting on the failure of the defendant to call a witness, and this Court cannot use such reasoning to find that a defendant's constitutional right to confront the witnesses against him was not violated. *See Ross v. State*, 603 So. 2d 857, 864 (Miss. 1992) ("the failure of either party to examine a

the camera's line of sight was blocked by another vehicle.

23

witness equally accessible to both parties is not a proper subject for comment before a jury")
(quoting *Brown v. State*, 200 Miss. 881, 887, 27 So. 2d 838, 840 (1946)).

¶36.    Second, as the proponent of the evidence, the State has "the burden of laying the
proper foundation for the evidence." *Buford v. Riverboat Corp.*, 756 So. 2d 765, 770 (Miss.
2000).  Because the identity of the voices goes directly to the foundation of the evidence, the
State most certainly had some obligation to determine their source.  Again, this holding
improperly shifts the burden of proof onto the defendant.

¶37.    Third, the opinion finds that Brown "could have subpoenaed 'Little Fudge'
Armstrong."  Even if Brown bore the burden of presenting his accusers to the jury, I fail to
see how testimony from Armstrong could have remedied a confrontation violation –
Armstrong's voice was not on the tapes.

¶38.    Finally, the opinion proceeds to quote, at length, this Court's decision in *Ahmad v.
State*, 603 So. 2d 843, 847 (Miss. 1992).  That decision is easily distinguishable from the
present case.  In *Ahmad*, the defendant claimed he was denied the right to confront his wife
who "was not a witness at the trial." *Id.*  Nothing in that opinion indicates that any statement
by Ahmad's wife was entered into evidence.  In the present case, the accusers' statements
were entered into evidence via a transcribed audio recording.  Thus, unlike *Ahmad*, Brown
was not permitted "to fully cross examine all State witnesses against him." *Id.*

¶39.    For the foregoing reasons, I would reverse the trial court's judgment and remand for
a new trial.

        **GRAVES, J., JOINS THIS OPINION.**

24